Good morning, your honors. I am back. I'm with the Federal Defenders of Montana out of the Billings Division. We raised, well, let me start this way, your honors. I believe that the government and I agree with almost all of the facts, the pertinent facts of this case, save two. The first is that I simply don't believe that the probation officers went to Mr. Halvorsen's house to arrest him. We continually use the word home visit. The word arrest is something different. There was testimony that she had that in mind when she came, was to arrest him. She did testify. Probation officer Emmett did testify. In fact, probation officer Frost said the same thing, that when Ms. Emmett came to him, they were going to arrest him. But nobody said that. And arrest is a different word than a home visit. Keep in mind, and we don't disagree, Mr. Halvorsen was not the best probationer that there was. In fact, he had had several lead-ups to this where he had had opportunities to correct his ways. And for the six weeks prior to this June 6th date – But doesn't – the terms of his probation were that incident to a home visit they could do a search. Is that not correct? Yes, they could. But they had to have – something had to happen. Some mechanism had to happen to change it from a home visit to a home search. Well, he had been in violation of practically every condition put upon him. So when they came on the home visit, clearly they could look for drugs. He'd been testing positive for drugs and then wouldn't come in for any more tests. Well, I agree with part of that comment, Judge Fletcher. What happened is, up to that point, that home visit was because he had missed a urinalysis and a breathalyzer that particular day. All the other violations had been dealt with up to that point. So when the probation office gets there at 820, it's because he hadn't been there reporting to the office to do those two things that day. And one of the other things, I think, that the testimony becomes kind of – Well, he's supposed to be home by 9, right? Yes, Your Honor, he was. In fact, they – Hiding inside the house, not opening the door. Well, that – Not opening the doors itself, violation, right? Yes, but they didn't know that until they discovered him. They suspected it. They kept hearing voices. They saw people in the house. They kept hearing sounds, and they kept knocking, and eventually they were proven right. They were let in the house, and there he was, hiding in a closet. Well, that's the second fact we disagree with. If they heard voices, that would have been in their report, because that would have been the reasonable suspicion to get in. And in fact, Frost says that. I go into the house – Well, they did eventually see somebody in the house. Yeah, and that's another problem. That's how he'll stand out there. If they know the guy's supposed to be home by 9 o'clock, and they're doing a home visit, and it's close to 9 o'clock, that's how he'll stand out there and keep knocking on the door and keep waiting for him to show up. Well, if he isn't there – I mean, you agree with that, don't you? No, Your Honor, I don't believe that the – You go there at 820, they knock on the door, nobody answers, they have to leave? They can't hang around and say, you know, in 40 minutes he must be home, so in 40 minutes he'll either be present or he'll be in violation of his condition of probation, and we're going to hang around and wait until he shows up or discloses his presence in the house or fails to show up. Absolutely. In fact, it's only 20 minutes. They get there at 840, Your Honor. But, yes, they can stand there until 9 o'clock, they knock on the door, he doesn't answer, then he's in violation, they go back to their office, they fill out the violation report, they ask the district judge – No, I'm sorry, why do they have to accept, when he doesn't open the door, why do they have to accept he's not there and go back to the office? Why can't they say, we actually think he is there, and we're going to keep trying, we're not going to let him get away with being home, not letting us in, and, you know, concealing drugs or guns or alcohol or any of the other things he's not supposed to be doing. That's a cheap way out to simply say, I wasn't home, big deal, when in fact what you're protecting by not opening the door is a far worse violation, which is drugs, alcohol, firearms, you know, all sorts of stuff. You can take it to even further. He could be committing active crime, but the state of Montana does not allow probation officers to enter a house, to break into the house, and that's what they did here. The woman opened the door, did she not? She opened the door, but how they get to that point is there's a piece of plastic over the door, there's a broken window, and it must have been opaque because when Mr. Frost opens it up, that's when he sees the woman. And what's telling about that is if you turn to Exit for Record, page 92, line 9, Frost says, I was going to reach through the glass and unlock the door because I heard voices in there, and as I pushed the plastic away, I saw a female in the residence. He then says, I was startled, I jumped back. That tells us two things. First of all, he couldn't see the woman until he pushes the plastic aside, so it's an opaque piece of plastic. He actually reaches in the door to unlock the door. He's breaking into the house, and Montana law does not authorize a probation officer to break into a house of a probationer just because they're not home. They suspected he was. Well, they suspected it because of the voices. They didn't do a couple of things. They circled the house, and there are three cars out there. He has to report what car is his, what license plate. They didn't check that. This is the age of cell phones. Simply call them up and say, hey, we're out front, open the door. They didn't do that either. What they did do was push the plastic aside, and I was startled, I would jump back. If they're really expecting people in the house, they'd have expected to possibly see somebody. He didn't. There's a difference between seeing someone and hearing someone. Both of them can inform you that someone's in the house. Well, here's the problem our position is. I don't think they heard anybody, Your Honor. Let's assume you're right about that. Let's assume. I'm sorry. You're right that they didn't hear or see anybody. The fact is he was in the house. The Montana law still does not authorize them to break into the house. At that point, he's in violation of his probation on two things. He failed to appear for the breathalyzer and the urinalysis, and now he's failed to comply with his curfew. Then they go home, and just like other probation officers. I'm sorry, but what does that have to do with anything we're talking about? So Montana law doesn't authorize us, so what? Well, this is a state probationer and state probation officers. The gun, the federal hook, doesn't come in until after they've arrested them. Let's say they violated state law, so what? I guess I'm not following that at all. Well, no, you explain it to me. Let's say they violated state law, so what? We don't enforce state law here. You've got to have a constitutional violation or something of that sort, something violating federal law. Let's say, in fact, they don't know he's home, and they, in fact, violate state law by opening the door. So what? Well, I have a problem in our case because the exclusionary rule. Why don't you answer my question, and then we talk about your problem? Well, I guess I don't. Why don't you explain to me what, why this matters? Why it matters is because we shouldn't, we don't give probation officers unfettered rights to go into probationer's houses. We have a federal court. Your client was found. In possession of a firearm after the fact, yes. Okay, so now you have to show us how obtaining that firearm, why introduction of that firearm, why the firearm should have been suppressed. And to do that, you have to point to some federal law that would justify suppression, usually constitutional. Well, I... So let's start with the assumption that there was a violation of state law. The... Was that also a violation of federal law? What about the cases about your home being near a castle? That's... Not your probation home is near a castle. Well, it is. With all due respect, probation officers have a less of an expectation of privacy, but they don't give up all privacy rights. And the officers here acted outside the parameters of their lawful duties. And they did it on multiple occasions, Judge Krasinski. After they break into the house, they detain a third person. And the law is pretty clear. You can't do that. And even if they find other evidence of wrongdoing... So that third person may have a very fine claim against them, and we may see that case as a 1983 case. And possibly they could have called the police, and maybe the Montana police would have come and arrested these people for breaking into the home. But what does it have to do with our case? Because then after they hold her, they call her name in, they find that there's a warrant for an unpaid traffic offense. They then research the house. Again, now they're doing a second search. They don't find any contraband initially in their sweep. And on the second search, they find Mr. Halverson hiding. That is a problem for us. Quite frankly, he is in the house. How do we use state law to determine the parameters of the privacy that probationers enjoy? Yes, you do, Your Honor. And, in fact, one of the problems in this case is there's a case in the state of Montana in the pipeline. Moody has decided several months after this that it delineates the home visit to the home search. And a home visit is just that. They're seeing if the probationer is doing right, as Judge Kaczynski suggests. They're seeing if there's drugs and those kind of things. A search is different. That's opening drawers. That's looking under beds. That's going into closets. That is allowed by a home visit, unless there's reasonable suspicion to do something else. But here's the last problem, Your Honor. Your guy was doing all sorts of stuff for weeks. He was drinking alcohol. He was consorting with people he shouldn't be. I mean, there's all sorts of stuff he was doing that suggests misbehavior on his part. All of those have been taken care of through information. Were they opening doors before they found him? I thought what they were doing, they went through the house once. A lot of lights were out. They couldn't see. And so they took another sweep and looked more carefully for places where a body might be concealed. On the second search? On the second search. They were not opening drawers. They were not looking in cubbyholes or behind pictures on the wall. But they were looking at the first places where your client might be hiding because they thought he was in the house. And they were right. Ultimately, they are right. No, they were right to begin with. They were always right. They suspected he was in the house, and they were right. They were confirmed in their being right, ultimately. After they arrested him, Judge Kulinski, the reason for their being there is done. They have a police officer come. They have the police officer take away both of these people. I'm sorry. They find the probationer hiding from them. They can't search the house to make sure that he's not committing other probation violations, like maybe he's got a gun there or maybe he's manufacturing meth, or maybe he's got vats of alcohol and it's still there. You don't think they can do that after they find him in violation of the condition that he opened the door and let them in? No. I don't believe that the probation officers then can stay in his house after he has been left, and they can toss his house. I don't believe that they can do that. What makes you say that? Because there's nothing that says that they can. The state of Montana's laws. What about the part of his probation condition that says he will not have certain items, he will not be in contact with certain kinds of people and certain kinds of materials, he will not use drugs, he will not use alcohol. Why can't they visit like that when they find him at home? They know he's present. Why can't they check and see that the materials he's not supposed to have are not in fact present? Because then what would be happening is the court would be authorizing just a general warrant, because you're on probation, I can do whatever I want in your house. I don't need the residence. You don't need a warrant to search a probationer's residence if the search clause is in his condition. They didn't go there for the search, and the state of Montana is very clear. There's home searches, there's home visits, and then there's arrests. If they were going to arrest him, they'd have said that. They didn't. After they've arrested him, the reason for him, they have the violations. At that point, they're done. What makes you say they're done? You might think they're done, but they might say no. This guy, we just caught him in another violation. He's hiding, not letting us in where he's supposed to. He must have a pretty good reason for not wanting to be caught in the house. If the house were clean, he would have come to the door and said, Here I am, come in, look around, do whatever you want. The fact that he's hiding is a pretty good indication that he must have some stuff in there that he doesn't want the probation officers to know about. In fact, he admitted it. Why isn't that a perfect justification? They'd be stupid. They'd be dumb enough. They'd need to be fired if they left the house without checking. I don't know if they would have been fired if they had not checked. They would certainly have been derelict. Derelict, that's what I would say. Thank you. Let's hear from the government. Yeah. Good morning, Your Honors. May it please the Court. My name is Ed Zink, and I represent the government in this case. Good morning to counsel. I think the Court has keyed in on some of the difficulties with Mr. Halverson's positions that I had difficulties with. Tell us right off, was there a breaking and entering? No. And the district court found specifically on that point, Your Honor, the district court at ER 29 and again at 31 in the court's written order indicated that they may have thought about going through the front door, but in fact a female whose last name was White in fact opened the door. And the district court wasn't swayed on that point. But it wouldn't matter. The probation officers would have had authority to go in under Montana precedent, and actually the testimony on that point was uncontroversial. Do they have the authority to break and enter? Yes, they do under certain circumstances. What are those circumstances? If they need to do property damage, a supervisor or the probation officer has to be called. They also have to have reasonable suspicion to get them to go through and across that threshold under the Montana precedent. In this case, however, it did not happen. I'm sorry, I just want to make sure I understand the question. So if they're going to actually have to break the lock, do property damage in opening the door, they have to have a supervisor? Yes, Your Honor. That's a negative answer. This is what they would have needed. But your full answer is they didn't need that because they didn't. There was no property damage done in this case. They didn't break in. The district court did not. Mr. Murchin says that they reached in and moved aside a plastic. But they didn't enter as a result of that. At most, they observed the female as a result of moving the plastic, but there was no damage done to the house, and there's certainly no testimony to support that on the record. And the district court found the contrary. So that's not considered breaking if you open the plastic and look in the house and reach in the door? That's not considered breaking under Montana law? I suppose it could be if it were actually followed through with an entry. But in this case, they were allowed in with consent by an occupant of the residence. I think what is interesting here, when you talk about what the probation officers can and cannot do and whether there is reasonable suspicion to search the home, Griffin v. Wisconsin really informs us on that point. And it requires probation officers and allows probation officers to consider everything they know about the particular probationer that they're supervising, his life, his circumstances, his behaviors on probation up to this point. As the court has already noted and the government has noted, Mr. Halverson's performance on probation was dismal. It was a series of failures responded to by the officers with an escalating series of new steps to persuade him to succeed and to give him the tools. Ultimately, they were unsuccessful, led to this visit at the home with the intent to arrest. The court asked some questions about the parameters, and I'm going to disagree strongly with counsel on this point. Once the probation officer has reasonable suspicion under Montana law that governs their conduct, as well as the three primary federal precedents, they can conduct a complete search. We're guided on what they can do by their conditions of probation. And in this case, at ER 136, the search of person or property upon reasonable suspicion by person, vehicle, and or residence may be searched at any time, day or night, without a warrant. That is the authority that gives the probation officers the ability and the authority and the legal basis to conduct a complete search of the home once they have reasonable suspicion. In particular, in this case, the defendant's firearm was not even located until long after he had admitted the reason he hid in the closet, and that's because he was frightened because he used meth the night before. It was also the reason he skipped the urinalysis test that day. He was afraid he was going to get caught, so he was scared. Once he makes that admission, the officers are going to obviously be derelict if they don't go looking for the meth that's in his house. And, in fact, they found meth. And one of the other things that happened to Mr. Halverson that night is he was arrested for a felony and prosecuted in State court for felony possession of methamphetamine. He was later convicted of that. After that occurs, they find the firearm in the closet. There's simply nothing unreasonable under the Fourth Amendment about any of this. And I agree, Judge, that they would have been derelict in their duty if they had heard his admission and his own reasons for hiding in the closet and then simply left, because they would have left a significant amount of contraband and evidence behind. As to State v. Moody, regardless of the terminology and the semantics used in this case by the probation officers, a home visit doesn't require any suspicion because it's not a search under Montana precedent. So they could conduct a home visit with no suspicion. And let's assume for the sake of argument that that's what was happening. It's like a bed check. I'm sorry? It's like a bed check. It is like that, Your Honor, but it's much, much more. They talk about... Basically, they can do it randomly or they do it unexpectedly, in the expectation that on nights or days when they don't do it, the probation will behave themselves because he never knows exactly when they show up. Exactly right. That's kind of the point of it, with two purposes. One, to help along the success of the offender, and two, to ensure that society is protected from further crimes. They need to find out who else, if anyone, is living there, meet those folks, which is what they did with Ms. White in this case. They get to walk around and look in every room, make an observation of the premises. They can even draft a floor plan for officer safety purposes, so in the event they have to come back later, they know the layout of the house. Certainly, they have to turn on lights to accomplish some of those things and to observe things in plain view, all within the confines of a home visit, if that's what we want to call it. And during just those activities, they would have found Mr. Halverson. They didn't open the closet door in this case. And, in fact, there's testimony to that point. It's uncontroverted at ER 112. The closet door was half open. What happened here is they went into the room during the first quick sweep of the house, tried the light switch immediately inside the door. No light came on. While Officer Emmett was speaking with the female, Officer Frost kind of peeked in the room and saw another light switch, turned that one on, and that illuminated the closet, and that's when he observed Mr. Halverson. This is not a case of officers going through drawers or going through small containers or anything like that. Okay, thank you. Thank you, Your Honors. Mr. Rosen, I think you're out of time. I am out of time, Your Honor. Okay, thank you. Case resolved. You will stand submitted. We'll next hear argument in the United States v. Grigas.
judges: Kozinski, Fletcher, Rawlinson